UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| ANIT WELLS and ROBERT WELLS, wife and husband, | NO. CV-05-0009-EFS |
|---|---|
| Plaintiffs, | |
| v. | **ORDER ENTERING FINDINGS OF FACT, CONCLUSIONS OF LAW, AND JUDGMENT** |
| COLUMBIA VALLEY COMMUNITY HEALTH, a domestic corporation; and THE UNITED STATES OF AMERICA, | |
| Defendants. | |

On October 23, 2006, this Federal Tort Claims Act case was tried to the Court.  Plaintiffs were present with their attorney, Louis Rukavina. Assistant United States Attorney Frank Wilson appeared for the United States.  The Court listened to the arguments of counsel and the testimony of the witnesses and reviewed exhibits admitted as well as the pertinent pleadings, including the Court's Pre-Trial Order (Ct. Rec. 73).  For the reasons orally stated on the record, the Court found the actions and omissions of Dr. Cynthia Durante, an employee physician of the United States, while at the Columbia Valley Community Health Center (hereafter,

ORDER ~ 1

"CVHC") had violated the standard of care expected of a reasonably prudent health care provider at that time in the profession or class to which she belonged in the state of Washington acting in the same or similar circumstances which proximately caused Plaintiffs' economic and non-economic damages.  The Court awarded Anit Wells $150,826.64 for her economic damages and $250,000.00 for her non-economic damages and Robert Wells, her husband, the sum of $100,000.00 for his non-economic damages. The Court allocated 95% fault to the United States and 5% fault to a non-party, Lake Chelan Community Hospital Home Health and Hospice ("LCCHH"). This Order is entered to memorialize and supplement the findings of fact and conclusions of law orally announced at the conclusion of trial.

## I.  HISTORY

Plaintiffs filed a proper administrative claim with the appropriate agency of the United States and satisfied all of the procedural prerequisites to filing suit; then on January 12, 2005, Plaintiffs filed suit against both Defendants in the Eastern District of Washington. Plaintiffs asserted a claim under 28 U.S.C §§ 2671-80, the Federal Tort Claims Act. This Court has jurisdiction pursuant to 28 U.S.C § 1346(b). The Eastern District of Washington is the proper venue for this action pursuant to 28 U.S.C. § 1391(e).  The United States filed an answer denying liability, but did admit that CVHC and any of its employees, including any contractor who is a physician, are deemed to be an employee of the Public Health Service pursuant to 42 U.S.C. § 233(a). Trial eventually followed.

///

///

ORDER ~ 2

## II.   TRIAL: Issues, Standards, and Evidence

The central issues at trial were whether or not the care given to Anit Wells by Dr. Durante, an employee of CVHC and therefore of the United States, between the first date of treatment, November 7, 2001, and the last date, March 26, 2002, was below the standard of care expected of physicians.  In a Federal Tort Claims Act case, the Court applies "the law of the place where the act or omission occurred," 28 U.S.C. § 1346 (b)(1), to determine what, if any, damages were caused thereby to Plaintiffs Anit and Robert Wells. *See Brock v. United States*, 601 F.2d 976, 978 (9th Cir. 1979).

In the state of Washington, a plaintiff who brings a claim of medical malpractice against a health care provider must prove that the health care provider failed to follow the accepted standard of care and that "such failure was a proximate cause of the injury complained of." RCW §§ 7.70.030(1) & 7.70.040(2).  Failure to follow the accepted standard of care is the failure of the health care provider to "exercise that degree of care, skill and learning expected of a reasonably prudent health care provider at that time in the profession of class to which he belongs, in the state of Washington, acting in the same or similar circumstances." RCW 7.70.040(1); *Harris v. Groh,* 99 Wash. 2d 438, 444-45 (1983).  Proof in such case must be by a preponderance of the evidence, that is, the plaintiff must prove by expert medical testimony that the act or conduct of the health care provider probably, or more likely than not, caused the injury or damage suffered. *Atwood v. Albertson's Food Ctrs,* 92 Wash. App. 326, 331 (1998).

To establish their claim that Dr. Durante and therefore the United States violated the standard of care in Washington thereby causing their injuries and damages, Plaintiffs called Dr. von Preyss Friedman, who is board certified in geriatric medicine with a specialty in long-term care. Dr. von Preyss Friedman is a professor at the University of Washington Medical School in the Department of Geriatric Medicine where she also has a clinical practice.  She is also the Medical Director of five long-term care facilities in the Seattle area.  This is the first medical malpractice case in which she has testified. Having reviewed all of the pertinent hospital and medical records, it was her opinion that Dr. Durante did not meet the standard of care for physicians caring for patients such as Anit Wells in the state of Washington under the same or similar circumstance and that the condition Ms. Wells is in today was, in terms of reasonable medical probability, caused by this violation of the standard of care.  In addition to Robert Wells, Plaintiffs also called two family members to prove the condition of Anit Wells in 2001 compared to her current condition.  The United States called several home health care nurses and Dr. Durante.  Dr. Tagge testified only to his brief hospital contact with Anit Wells at the request of Dr. Durante on March 26, 2002.  However, the United States did not call any expert witness to dispute the opinions of Dr. von Preyss Friedman on liability or damages.

### III.  FINDINGS OF FACT

To supplement the lengthy oral findings and conclusions of the Court at the end of trial, the Court makes the additional findings of fact.

1    On November 7, 2001, Anit Wells became a patient of Dr. Cynthia

2  Durante at the CVHC in Chelan, Washington.  Dr. Durante was an employee

3  with CVHC and, therefore, per 43 U.S.C. § 233(a), an employee of the

4  Public Health Service, an agency of the United States of America.  She

5  worked three days a week at CVHC.  At that time, Anit Wells had suffered

6  for many years from an undiagnosed neuromuscular disorder for which she

7  was seen by a number of physicians.  This condition required her to use

8  a wheel chair for many activities of daily living though she had been

9  able to travel with her family for shopping trips and had been able to

10 use a walker for some activities as late as the fall of 2001.  Her

11 husband, Robert Wells; her daughter, Ashley Wells; and son-in-law, Lance

12 Rendell,  testified credibly to that effect.  In sum, in 2001, though

13 confined to a wheelchair, Anit Wells was able to independently move

14 herself about her home to perform various activities of daily living such

15 as perform some household chores, access the refrigerator, fix herself

16 sandwiches, make herself understood and understand the communications of

17 others, and remain alone while her husband ran errands.  She did wear a

18 form of a diaper for urinary incontinence but not fecal incontinence, did

19 not need a catheter but did need help with showers, and had no skin

20 ulcers at that time.

21    From that time until March 26, 2002, when Dr. Durante left her

22 position with CVHC, she was the primary treating physician for Anit

23 Wells. During that time, Anit Wells was seen by Dr. Durante on several

24 occasions and at her orders, also by the nurses from LCCHH.  In late

25 February, Dr. Durante notified her patients including Anit Wells that she

26 was leaving her position at the clinic on March 26, 2002.

ORDER ~ 5

No lab work was ordered when Anit Wells was first seen in November. While the United States makes much of the fact that she missed appointments before she was seen again in December 2001, there is no evidence that these missed appointments played a role in the present unfortunate condition of this woman. However, it is pertinent and contributory that no lab work was ordered in November 2001, hence no baseline was established. It is also pertinent that she was on Relafen, an anti-inflammatory with a known side effect of intestinal bleeding.

Anit Wells was seen at the CVHC for a flu shot after November 7, 2001, but was not seen by Dr. Durante again until December 31, 2001. During that appointment, the doctor observed a small skin ulcer on her left hip and ordered home health care from the LCCHH nurses. Again, no lab work was ordered though an appointment was made for a physical exam on January 9, 2002; that exam did not occur until February 2002. Those nurses visited Anit Wells and treated her skin ulcer caused by pressure on that area. Their treatment was successful; the ulcer healed and she was discharged from further care by them on February 15, 2002. She saw Dr. Durante on February 18, 2002. By that time, Dr. Durante had obtained and reviewed her medical records. At that time lab work was ordered, blood was drawn and sent to a laboratory for analysis including a complete blood count (CBC), complete metabolic panel (CMP), and iron studies. Those studies revealed that Anit Wells had very low levels of hematocrit, 23.7, of albumin, 1.7, and a high platelet count of 1,086. This indicated that she was suffering from a severe iron deficiency anemia and was severely malnourished. Dr. Durante attempted to contact the Wells and next saw Anit Wells on March 4, 2002, when she ordered iron

supplements but did not order more lab tests.  On March 11, 2002, Robert
Wells returned with his wife to the clinic concerned about two ulcers,
or bed sores as they are commonly referred to in people who are confined
to bed and wheelchairs.  These were located on the sacrum and coccyx of
Anit Wells.  Again, Dr. Durante did not order lab work but did order
resumption of home health care by the nurses at LCCHH. They visited and
noted the ulcer was Stage Two.  The concern was that Anit Wells was
severely malnourished and anemic which increased the challenge of
preventing the recurrence of these skin ulcers in areas that received
pressure from prolonged stays in bed and wheel chairs. Over the next few
weeks, Anit Wells' condition rapidly deteriorated. While she had been
assessed by these nurses as needing assistance with activities of daily
living in January 2002, Anit Wells became totally unable to care for any
of her daily needs in the weeks following her March 11, 2002,
appointment.  Her condition alarmed the nurses who were providing home
health care and they notified Dr. Durante of their concerns.  Dr. Durante
again did not order lab work but authorized insertion of a catheter for
urinary incontinence which was contributing to the lack of healing of the
skin ulcers.  No catheter was inserted by the nurses apparently because
Robert Wells convinced them that he could keep that area dry by his
constant care.  The failure of the nurses to catheterize Anit Wells was
a factor in the continued ulceration of her sacral area due to the
continued presence of urine.

Despite the effort of Robert Wells to care for his wife, her
condition worsened.  Her visiting nurses became alarmed that she needed
"end of life" measures and communicated that to Dr. Durante who did not

1    order lab studies or that the patient be brought to a hospital or
2    transfused.  At one point, Anit Wells' blood pressure was 70/0 as no
3    dystolic pressure could be measured, and the nurses described her as
4    having overwhelming care needs.  By March 26, 2002, Robert Wells became
5    so alarmed by his wife's condition and pain and the odor in her bedroom
6    that he took her in to see Dr. Durante.  At that time, Dr. Tagge was in
7    the hospital where CVHC was also located and agreed to see her though he
8    wrote no consultation note and did not charge for the consultation.  He
9    thought she needed a debridement of the ulcers but made no appointment
10   to do.  Dr. Durante, working her final day at CVHC on March 26, 2002,
11   allowed Anit Wells to go home.

12       With regard to Dr. Durante's care of Anit Wells through March 26,
13   2002, Dr. von Preyss Friedman opined that Dr. Durante's care violated the
14   standard of care expected of health care providers in the state of
15   Washington in that class of treatment providers in the same or similar
16   circumstances.  Her reasons for this opinion were that the lab values of
17   Anit Wells' blood drawn on February 18, 2002, for both albumin and
18   hematocrit were perilously low indicating both severe iron deficiency
19   anemia and malnutrition which mandated immediate differential diagnosis
20   to determine the cause.  She testified that Dr. Durante had an obligation
21   to do a rectal exam to determine if there was intestinal bleeding, that
22   she should have discontinued Relafen with its known side effects of
23   intestinal bleeding and the likely cause of her continued severe iron
24   deficiency anemia, that she should have obtained additional lab tests to
25   determine if Anit Wells' hematocrit and albumin levels were continuing
26   to decrease and, if that were true, she should have admitted her to the

hospital for a transfusion. Transfusion would have improved her oxygen carrying capacity giving her increased capacity to heal her decubitus ulcer. It was her opinion that the failure to take any of these steps put Anit Wells at the risk of exactly what happened; her decubitus ulcer worsened because she had severe iron deficiency anemia and was malnourished.

The Court finds unfortunately those steps were not taken by Dr. Durante. Had she ordered follow-up tests for albumin and hematocrit, it is probable that they would have been lower, confirming the need for the action that Dr. von Preyss Friedman opined the standard of care called for. Of course, Anit Wells' albumin and hematocrit levels were obtained on admission to the hospital on March 28, 2002, and were found to have decreased. Instead, none of these critical tests were ordered or treatments begun with the result that Anit Wells' condition deteriorated to the point where the nurses could not obtain a dystolic blood pressure reading, they insisted that she be seen by Dr. Durante on March 26, 2002, she became completely dependent for all of her daily needs, had great difficulty eating, and developed a Stage Four ulcer in her sacral area necessitating hospitalization, transfusions, debridement, a skin flap procedure necessary to cover the deep ulceration with tissue loss in the sacral area, and months of recovery from those painful conditions and procedures; now Ms. Wells is completely bed ridden and totally dependent on her husband all of the time. The Court finds the testimony of Dr. von Preyss Friedman credible, supported by the medical and hospital records admitted in evidence, and persuasive. Dr. Durante failed to act within the standard of care expected of health care providers in the state of

Washington.  She did none of the follow-up blood tests that should have been done to make a differential diagnosis, did not tell Anit Wells to stop taking Relafen, which was the likely cause of intestinal bleeding and a major factor in her severe iron deficiency anemia, and did not admit her to a hospital to transfuse her, all of which would have likely avoided the devastating debilitation that Anit Wells suffered between February 18, 2002, and March 26, 2002, which caused her subsequent hospitalizations, surgeries, and permanent debilitation.

What followed after Dr. Durante left the clinic is instructive. Though Dr. Durante did not admit Anit Wells to the hospital on March 26, 2002, the visiting nurse and Robert Wells were gravely concerned. In particular, the nurse noted that the ulcer was malodorous, showed necrotic tissue and was Stage Four, the most serious stage of ulceration, typically meaning that the ulcer was down to the bone.  By March 28, 2002, the home health care nurse arranged with a doctor for the admission of Anit Wells to the Central Washington Hospital where lab work was finally done and revealed values even lower than those in February 2002. She was given four units of packed red blood cells and her ulcer was debrided.  Relafen was discontinued, and her condition improved to the point where in May 2002 she was taken to Swedish Hospital in Seattle for a skin flap procedure to close the wound that had been caused by the ulceration in the sacral area of her low back.  Dr. von Preyss noted that after Anit Wells was transfused, as she believed was necessary in February and March, and the Relafen was discontinued, her condition stabilized.  This confirmed the steps that Dr. Durante should have taken and failed to.

ORDER ~ 10

1    Thereafter Anit Wells was readmitted to Central Washington Hospital
2    from which she was discharged in June 2002.  Home health care continued.
3    Throughout these many hospitalizations, Robert Wells was constantly at
4    her side providing such support as he could.  Her condition stabilized
5    with those treatments though she is now completely and permanently
6    bedridden, permanently catheterized, permanently unable to care for any
7    of her needs, and is totally dependent on her husband with some
8    occasional support from others in the family.

**A.   Medical Costs**

10   The cost of her care from March 28, 2002, to October 31, 2002 was
11   $150,826.64.  Dr. von Preyss Friedman testified that those expenses were
12   customary in amount and necessary to treat the conditions of Anit Wells
13   caused by the failure of Dr. Druante to meet the standard of care.  The
14   Court finds those expenses were both reasonable in amount and necessary
15   to treat the conditions caused by the failure of Dr. Durante to treat
16   Anit Wells within the standard of care expected of health care providers
17   in the state of Washington acting in the same or similar circumstances.

**B.   Past and Future Non-Economic Damages**

19   Dr. von Preyss Friedman also opined that the fact that Anit Wells'
20   condition has not changed since October 31, 2002, convinces her that on
21   a more probable than not basis her current condition is the result of the
22   failure of Dr. Durante to meet the standard of care and not of any other
23   cause or condition.  Supporting this opinion is the recitation in the
24   nurses' notes of Anit Wells' horrific debilitation from a person who
25   could do many of her activities with assistance to one who needed an end-
26   of-life plan and the findings in the hospital record upon her admission

on March 28, 2002. The Court finds this testimony credible, unrebutted and convincing.

Anit Wells experienced the pain and suffering that accompanies an ulcer in the sacral area of her low back which had gone through the skin and subcutaneous layer down to the bony area of the sacrum. She was in agonizing pain throughout late February and March 2002, some six weeks when she lost what capacity she had to care for her own needs, to make a sandwich, to travel around her house in her wheel chair, and to go out to shop and to dinner with her family albeit in a wheel chair or walker. Now confined to bed, catheterized, and totally dependent on her husband for all of her needs she has lost everything but life itself. When one has few simple pleasures in life and those are taken from you as in this case, the loss is devastating. The Court finds her non-economic damages for pain experienced and to be experienced as well as her loss of enjoyment of life to be in the sum of $250,000.00.

As for Robert Wells, he is a devoted husband, as testified to by his daughter and son-in-law as well as noted in the hospital records. Many couples wed repeating the words "in sickness and in health" but none imagine a future which includes total care for a completely bedridden and dependent spouse every hour of every day of each year. Such is the reality for Robert Wells. His claim of non-economic damage in the sum of $100,000.00 is the amount he sought in his administrative claim. It is little enough. The Court finds Robert Wells, due to his wife's condition, which is the result of the failure of Dr. Durante to follow the standard of care, has experienced and will continue to experience loss of consortium in the sum of $100,000.00.

ORDER ~ 12

**C.   Apportionment of Fault**

The Court finds the United States through the actions and omissions of its employee, Dr. Durante, was 95% at fault and the LCCHH through the actions and omissions of its nurse employees was 5% at fault.  In other words, the United States caused 95% of the Plaintiffs' injuries and damages, and the LCCHH, a non-party, caused 5%.  RCW 4.22.070(1).  The Court finds Anit and Robert Wells are fault free.

<h3 align="center">IV.   CONCLUSIONS OF LAW</h3>

1.   Dr. Cynthia Durante, an employee of the Columbia Valley Health Clinic and of the United States, violated the standard of care expected of health care providers in the state of Washington who undertake the care of patients such as Anit Wells between February 18, 2002, and March 26, 2002.  Accordingly, the United States is liable for such injuries and damages as that violation of the standard of care caused.

2.   Dr. Durante's violation of the standard of care caused injury and damage to Anit Wells and her husband, Robert Wells.

3.   LCCHH Nurses, who attended to Anit Wells between February 18, 2002, and March 26, 2002, also violated the standard of care expected of health care providers in the state of Washington.

4.   Their violation of the standard of care was a cause of the injury and damage to Anit Wells and her husband, Robert Wells.

5.   Plaintiffs Anit and Robert Wells did not act in any way which caused or contributed to their injuries and damages.  They are faultless.

6.   Plaintiff Anit Wells suffered economic damages in the amount of $150,826.64.

ORDER ~ 13

7.   Plaintiff Anit Wells suffered non-economic damages in the sum of $250,000.00

8.   Plaintiff Robert Wells suffered non-economic damages in the sum of $100,000.00.

9.   The United States caused 95% of the Plaintiffs' injuries and damages, and the LCCHH, a non-party, caused 5%.

**IT IS SO ORDERED.**  The District Court Executive is directed to:

1.   Enter Judgment against the United States in the sum of **$475,785.31** (95% of $500,826.64);

2.   Enter this Order; and

3.   Provide copies to counsel.

**DATED** this____27th____ day of December 2006.


_____S/ Edward F. Shea_____
EDWARD F. SHEA
United States District Judge

Q:\Civil\2005\0009.findingsfact.concllaw.wpd

ORDER ~ 14